State, ex rel. City of McCook, v. Marsh.

---

STATE, EX REL. CITY OF McCOOK, RELATOR, V. GEORGE W. MARSH, AUDITOR OF PUBLIC ACCOUNTS, RESPONDENT.

FILED FEBRUARY 16, 1922.   No. 22455.

1. **Municipal Corporations: PAVING CONTRACT: VALIDITY.** Where a city engineer of a city of the second class acting under the provisions of section 5011, Rev. St. 1913, submits to the city council in writing an estimate of the cost of a paving improvement, based upon the unit plan, and also based upon the then existing freight rates upon the materials to be used, which estimate is supplemented by a verbal report to the city council that, if the freight rates on the materials to be used should be advanced, his estimate of the cost should be correspondingly increased, and where the city council enters into a contract with a person

to do such paving for the unit prices named in such estimate, which contract contains a stipulation that, if the freight rates upon the materials used should be advanced, the cost should be correspondingly increased, and, if lowered, correspondingly decreased, such contract is a compliance with section 5011, Rev. St. 1913, which requires that no contract shall be let for a price in excess of the engineer's estimate.

2. ———: ———: ESTIMATE BY ENGINEER. This section of the statute does not require that the engineer's estimate of the cost should be in writing; and where the engineer submits an estimate, partly in writing and partly by parol, the two parts will be considered together as constituting the complete estimate for the guidance of the city council.

3. ———: ———: LETTING CONTRACT. Such section of the statute does not require that the city council should, before letting a contract, advertise for bids and let the contract to the lowest responsible bidder upon competitive bidding.

4. ———: ———: ESTIMATE BY ENGINEER. The inhibition contained in this section of the statute upon the action of the city council is that the engineer's estimate of the cost must be made before the contract is let, and that no contract shall be entered into for a price in excess of the engineer's estimate.

5. **Obiter Dictum.** The case of *Fulton v. City of Lincoln*, 9 **Neb.** 358, in so far as it seems to announce a rule contrary to the views herein, is *obiter dictum*, and not binding as a precedent.

ORIGINAL proceeding in mandamus to compel respondent, as auditor of public accounts, to register bonds of relator. *Writ allowed.*

*Stout, Rose, Wells & Martin* and *John F. Cordeal,* for relator.

*Clarence A. Davis, Attorney General,* and *Mason Wheeler, contra.*

*John P. Breen, amicus curiæ.*

Heard before MORRISSEY, C.J., LETTON, DEAN, DAY and FLANSBURG, JJ.

DAY, J.

This is an original action in mandamus in this court brought by the state, on the relation of the city of

McCook, against George W. Marsh, Auditor of Public Accounts of the State of Nebraska, to compel him as such auditor to duly register certain "intersection paving bonds" issued by the relator city, aggregating the sum of $100,000; and also to compel him to register certain "district paving bonds of district No. 2" of said city, aggregating the sum of $203,000.

The refusal of the auditor to register the bonds was based upon two grounds: First, that the contract for the paving for which the bonds were issued was in violation of section 5011, Rev. St. 1913, in that the cost of the paving named in the contract was in excess of the engineer's estimate; and, second, that after the original contract was let the council by ordinance increased the width of the pavement to be laid upon certain streets and let the contract for the increased amount to the original contractor, without having first obtained an estimate of the cost from the city engineer, and without advertising for bids, and without letting the contract upon a competitive basis.

No question is raised as to the validity of the ordinances creating the improvement district, declaring the necessity of paving certain streets and alleys, and designating the width of the pavement to be laid thereon. By direction of the city council the city engineer prepared plans and specifications for the improvement in accordance with the ordinances, and made an estimate of the cost thereof which were adopted and approved by the city council, and the city clerk was ordered by the council to advertise for bids for the proposed improvement. The estimated cost of the improvement by the engineer was based upon the unit plan. For example, he submitted four different types of paving, estimating the cost of each of them at a certain amount per square yard. He also estimated that the excavating and grading would cost $1.25 per cubic yard, and in the same manner estimated the cost of curbing and guttering at a certain price per lineal foot. This

general idea of reducing the cost to the unit plan was carried out with respect to the other items entering into the work upon which bids were asked. He also made a calculation of the total amount of the work to be done, and reduced it to an aggregate sum. The proposal of J. C. Brodie & Company corresponded exactly with the unit cost of the several items as estimated by the city engineer. The proposal, however, stated that the bid was based upon the then existing freight rates on the materials used in the work, and that, if the freight rates were increased during the progress of the work, the bid should be correspondingly increased, and, if this were not done, the bidder would not enter into a contract with the city to perform the work. It appears that the engineer verbally reported to the council that the unit prices of his estimated cost were based upon the then existing freight rates, and, if the freight rates were increased, his estimate should be correspondingly increased. The city council thereupon entered into a contract with J. C. Brodie & Company to do the work, which contained a provision as follows: "It is hereby understood and agreed that any increase in freight rates over and above the rates in effect on the date of this proposal, that said unit prices will be increased proportionately and reduced likewise if there is any reduction in rates." The freight rates were in fact increased while the work was in progress, and on the material used in performing the contract amounted to $10,741.34. It appears, further, that, when the contractors were ready to commence the work and had taken possession of the streets for that purpose, certain property owners along the proposed improvement appeared before the city council and requested that the width of the pavement as to certain portions of the street be increased. As a result of this request the city council increased the width of the paving on several of the streets. The council did not cause a written estimate of the cost of this additional work to be made by the city engineer. He

did appear before the council, however, and stated that the estimated cost of the additional work would be ascertained by multiplying the number of square yards of additional pavement by the unit cost set forth in his original estimate. The contract for the original work contained a provision, as follows: "It is further understood and agreed that should the city desire to increase or decrease said quantities or amounts set forth in the schedule, the said lump sum will be increased or decreased at the rate stipulated." By agreement with the council and the contractor the additional pavement was laid by the contractor upon the basis of the unit price in the original estimate. The final estimate showed that the cost of the work was as follows: Intersections, to be charged to the city at large, $100,059.35; amount to be charged to private property, $271,202.67.

By resolution the city council adopted, approved, and accepted the work, and fixed a date for the sitting of the council as a board of equalization for the purpose of assessing special benefits or injuries sustained in consequence of the improvement. Thereafter proceedings were regularly taken, and upon due notice a hearing was held by the city council sitting as a board of equalization, at the conclusion of which a resolution was duly passed assessing the cost of the work, other than the cost of the intersections, to the property within the district, according to benefits. No appeal was taken from this action of the council, and the property owners would now be estopped to raise any question as to the validity of the assessment. The city council also provided that the cost of the intersections should be borne by the city at large. As before intimated, the total amount of the special assessments levied against the property within the district was $271,202.67, which, under the law, was payable in 20 instalments, the first instalment becoming delinquent in 50 days. Under the law, property owners had the right to pay the entire assessment within 50 days and thus escape the payment

of any interest. During the 50 days' period the prop-
erty owners paid assessments aggregating the sum of
$68,308.44, of which amount $61,255.81 was for payments
in full of the entire assessments levied against the
property, and $7,053.65 were payments on first instal-
ments. By ordinances duly and regularly passed the
council, acting under chapter 50, Laws 1919, authorized
the issuance of $100,000 of intersecting paving bonds, and
$203,000 of district paving bonds, the proceeds to be
used in payment of the pavement in question. These
bonds were issued, and are the ones presented to the
auditor for registration.

The city of McCook is a city of the second class, and
the proceedings of the city council in letting the contract
for the paving were had under section 5011, Rev. St.
1913. The provisions of that section, in so far as they
relate to the question now being considered, are as
follows:

"Before the city council shall make any contract for
building bridges or sidewalks, or for any work on the
streets, or for any other work or improvement, an esti-
mate of the cost thereof shall be made by the city
engineer and submitted to the council, and no contract
shall be entered into for any work or improvement for
a price exceeding such estimate, and in advertising
for bids for any such work the council shall cause the
amount of such estimate to be published therewith."

The first question which deserves consideration is
whether the contract which was entered into between
the city and Brodie & Company was for a price in
excess of the estimated cost made by the city engineer.
It will be observed that there is nothing in the statute
above quoted which requires the estimate of the engineer
to be in writing. The requirements of the statute could
be met by a written or a verbal estimate, or by a written
estimate supplemented by a verbal statement, as was done
in this case. It will be noted that the only inhibition
upon the council's action is that, before letting any

contract for any work or improvement, an estimate of the cost thereof shall be submitted to the council by the engineer, and that no contract shall be let for a price exceeding such estimate. One of the purposes of requiring an estimate of the cost to be submitted to the council, and of limiting the power of the council to contract, is that the council may have competent expert advice upon the probable cost of the work and thus be protected from imposition. It appears that before the contract was let the city engineer made a verbal report to the council, in which he stated that the unit prices in his written estimate of the cost were based upon the then existing freight rates upon the materials to be used, and that, if the freight rates upon such materials were advanced, his estimate of the cost should be correspondingly increased. The council thereupon entered into the contract upon the basis of the unit cost of the several items, as estimated by the engineer, containing the provision hereinbefore quoted, to the general effect that, if the freight rates upon the materials used were advanced, the unit prices were to be correspondingly increased, and, if the freight rates were reduced, the prices were to be correspondingly lowered. In entering into the contract in this form, it seems to us to be clearly within the estimate of the cost as made by the city engineer. While it is true that the engineer did not, and in fact could not, reduce to dollars and cents the amount which should be added to his original estimate, occasioned by a possible increase in the freight rates, he gave the data from which the exact amount might be ascertained. At the time the contract was entered into business conditions were such that it was generally regarded that there would be an increase in freight rates, but no one could determine in advance what the increase would be. The power to fix the rates was in the hands of public officials. It has been held that, where the cost of an item of expense is fixed by another proceeding, no estimate of the cost is necessary. *Goodwillie v. City of Lakeview,* 137 Ill. 51. It

should be further borne in mind that the increase in the freight rates, if any, in no wise inured to· the benefit of the contractor. The contract was reciprocal, and con-. tained a provision that, in the event the present freight rates upon the materials used were decreased, the contract price was to be correspondingly decreased. In letting the contract in this form the council acted within the spirit of the law.

But it is argued that, in letting the contract contain· ing provisions not embodied in the estimate which was published at the time bids were asked for on the work, other bidders were deprived of the right of fair competition. The argument assumes that it was necessary to advertise for bids, and also to let the contract to the lowest responsible bidder. There is nothing in the statute, however, pertaining to the government of cities of the second class which requires this to be done. We have statutory provisions affecting certain classes of cities and municipal corporations which require an advertisement for bids and the letting of contracts to the lowest responsible bidder, where the expenditure is over a given sum; but these provisions, however salutary they may be, cannot be construed as applying to cities of the second class. If section 5011, Rev. St. 1913, should be construed as requiring that resort must be had to competitive bidding in letting contracts for public work, then it is manifest that in every instance, however trivial the expenditure might be, resort must be had to that method in letting contracts, because there is no maximum amount named, as is usually the case, within which the council might contract without asking for bids. In passing, we may say that the provision of section 5011 we are now considering has been in force, unchanged in its language, for almost 50 years, and, generally speaking, has been found sufficient to meet the requirements of cities of this class. We are aware that· in *Fulton v. City of Lincoln,* 9 Neb. 358, language is used in considering the statute which might be con-

strued as requiring contracts for public work to be let upon competitive bidding and to the lowest bidder. In determining the question before the court, it was unnecessary to say that "the mayor and council can only bind the city by a contract made with the lowest bidder therefor after publication of notice and fair competition." The clause above quoted is mere *obiter dictum,* and not binding as a precedent. The case was not even cited by respondent in his brief.

In the case of *Yarnold v. City of Lawrence,* 15 Kan. 126, the court had before it for construction a statute identical in substance and almost identical in terms with ours. In the course of the opinion prepared by Mr. Justice Brewer, it was said:

"That section provides that, prior to any contract, the city engineer shall make and submit to the council an estimate of the cost, and that in advertising for bids the amounts of such estimate shall be published. Counsel contend that the city is required to advertise for bids, and that, therefore, when the bids are received, she must let to the lowest bidder. We dissent from both premise and conclusion. The section does not declare that before any contract is let an advertisement shall be made for bids. It simply says that, 'in advertising for bids,' certain things shall be published. Requiring that, when an advertisement is made, certain things shall be published, is by no means equivalent to requiring that advertisements be made in all cases. We see no reason to doubt the right of the city, under that section, to make a valid contract without any advertisement. Nor does it necessarily follow from the fact of an advertisement for bids, that the contract must be let to the lowest bidder. There is a strong implication that such ought to be the result, but it is not the necessary legal conclusion. We think, therefore, that the contract in question must, under the law in force at the time it was made, be sustained."

With respect to the objection that the contract was

let to the original contractor for the additional work occasioned by widening the pavement on a portion of the streets, without an estimate, and without an advertisement for bids and an opportunity for competitive bidding, it would seem that what has been said is a sufficient answer to this objection. It must be borne in mind that the engineer's estimate was made upon the unit cost basis, and any additional work caused by the widening of the pavement upon certain of the streets would involve only an increase in the quantity of work to be done. It appears that the engineer told the council that the additional cost could be arrived at by multiplying the number of square yards of additional paving by the unit cost set forth in the original estimate. Besides this, the contract specially provided that the amount of the work might be increased or decreased at the election of the city.

Other reasons might be advanced upon which the bond issue should be sustained, but we deem it unnecessary to prolong this opinion by considering them. As before stated, the city has approved and accepted the work, the assessments have been made to pay for the same, and a considerable portion thereof has in fact been paid. None of the property owners have taken any appeal from the action of the city council sitting as a board of equalization, and they are now estopped from raising any question as to the validity of the contract. The liability has thus become fixed. The issuance of bonds is a mere substitution of the form of indebtedness which the city owes.

Under the facts as shown by this record, we are of the view that the action of the city council in letting the original contract, as well as the contract for the additional paving occasioned by the widening of the pavement on certain of the streets, was well within their power, and was a substantial compliance with the law in all respects, and that the issuance of bonds under the provisions of chapter 50, Laws 1919, for the purpose

. of paying for the improvement was a proper exercise of its powers.

The bonds are entitled to registration.

WRIT OF MANDAMUS ALLOWED.