HENRY S. WESTBROOK V. STATE OF NEBRASKA.

FILED JANUARY 23, 1931. No. 27525.

*Pitzer & Tyler* and *Lloyd E. Peterson,* for plaintiff in error.

*C. A. Sorensen, Attorney General,* and *George W. Ayres, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

DEAN, J.

Henry S. Westbrook was informed against in the district court for Otoe county and there charged with having knowingly, unlawfully, and feloniously received and accepted a draft in the sum of $1,482.60 from Henry Kasbohm, March 24, 1927, for deposit in Kasbohm's account in an insolvent bank, namely, the Dunbar State Bank, of which defendant was then vice-president, and which defendant then well knew was insolvent. But the insolvency of the Dunbar bank was then unknown to Kasbohm. Upon submission of the evidence the jury found the defendant guilty and the court thereupon sentenced him to serve an indeterminate term of not less than one nor more than two years in the penitentiary. The defendant has prosecuted error.

The defendant, as alleged grounds for reversal, contends that he was not aware of the insolvency of the Dunbar State Bank when he accepted the Kasbohm draft for deposit. The Dunbar bank was declared insolvent April 4, 1927, and was then taken over by the department of trade

and commerce. The active personnel of the bank some time before that now in question consisted of Thomas Murray, the president, the defendant Westbrook as vice-president, and a bookkeeper. That Murray knew of the bank's condition is disclosed in a letter addressed by him to the defendant after he, Murray, disappeared. In this letter Murray left directions in respect of the proposed disposition of certain of the bank's business, but he therein informed the defendant that he did not expect to return.

Evidence was introduced tending to prove that the defendant was not a novice in the banking business and that he had for many years been acquainted with the affairs of the Dunbar bank. At the time in question he was over 50 years of age. The bookkeeper of the bank produced records of stockholders' and directors' meetings from 1914 to 1927 that were attended by the defendant. But the defendant contends that he was not in the bank every day. The bank records, however, disclose that he was there much of his time and that, in Murray's absence, he was in charge of the bank. And it is disclosed that the defendant often signed papers connected with the bank's business and that he was then and for many years had been familiar with its condition.

In view of the present record, it is inconceivable that the defendant did not know of the insolvent condition of the bank at the time in question here, as he now contends. And besides he testified that it was his duty to take care of and to handle the correspondence, and, in view of this admitted fact, it follows that defendant must have had knowledge of the then untoward condition of the bank through the letters, and other written items of bank correspondence and procedure generally, that were received by the bank from time to time, including, of course, those received by the bank from the department of trade and commerce. In some of the department letters the bank was informed that it was carrying too many unsecured loans and that the bank's reserve fund was too low to com-

ply with the legal requirements. It also appears that the defendant knew that ineffectual efforts had been made by those interested in the bank to secure more loans, and that many notes were being carried as a part of the bank's assets, notwithstanding the significant fact that the makers of such notes were, in many instances, unable to meet the payments of their matured obligations, as shown by the record. In fact, the evidence of one of the bank examiners disclosed that the insolvency of the bank amounted to about $194,000 at the time the deposit in question here was received by the defendant.

Mr. Kasbohm, whose draft was accepted by defendant for deposit, testified: "Why, I asked Mr. Westbrook—I met him on the street there and I says, 'Mr. Westbrook,' I says, 'Didn't you know that bank was insolvent when you took that deposit of mine?' He says, 'Yes; I did.' I says, 'What did you take that deposit for?' He says, 'Because we needed the money.' I says, 'I want my money, and I don't believe I am going to get it.' He says, 'If you know how to get it, go ahead and get it.'"

The insolvency of the bank at all times material to this inquiry is clearly established. And it is elementary that evidence in respect of the amount of valid deposits, and also the number of notes, both good and worthless, in a bank at a time such as prevailed in the present case, is admissible to show insolvency. *State v. Shove,* 96 Wis. 1.

Defendant's association with the bank and his control of its daily affairs in the absence of the president as above noted, was such as clearly to charge him with knowledge of its insolvency at the time material to this inqury. In *State v. Cadwallader,* 154 Ind. 607, it was held that a defendant who had been president of the bank there in question for three years was charged with the duty of knowing the condition of the bank at the time he received a certain deposit, and that, if at that time the bank was insolvent, the inference or presumption would arise that he, as such president, had knowledge of the insolvency. And, in the present case, where the defendant is charged with having

received a deposit with knowledge of the bank's insolvency at the time of its acceptance, it is competent to admit evidence in respect of the assets and liabilities of the bank, at and before the time in question here, to the end that the fact of defendant's knowledge of such insolvency may be established. See *Parrish v. Commonwealth*, 136 Ky. 77.

Defendant also contends that section 8010, Comp. St. 1922, under which he was convicted, violates the provisions of section 14, art. III of the Nebraska Constitution, which provides: "No bill shall contain more than one subject, and the same shall be clearly expressed in the title." The title to the act of which section 8010 is a part appears to be a part of chapter 190, Laws 1919. The title, so far as applicable, follows: "An act to adopt and establish a Code of laws for the state of Nebraska relating to the civil government of the state and to provide for their administration and enforcement. to be known as the Civil Administrative Code."

We think the title is broad enough to cover and clearly to include provisions for the regulation of the banking business as contained in the above cited section 8010, and that such regulations are clearly relevant to the subject-matter contained therein. In *Mehrens v. Bauman, ante,* p. 110, we held: "Where the title of an act fairly gives expression to the general subject-matter contained in the act, such act will not be held invalid as being broader than its title."

We have examined the instructions and conclude that the objections thereto are without substantial merit. No verdict other than that returned by the jury should have been rendered under the facts. The evidence supports the verdict and it follows that the judgment must be and it hereby is

AFFIRMED.