STATE OF NEBRASKA v. THOMAS J. KASTLE.

FILED MARCH 6, 1931. No. 27624.

C. A. Sorensen, Attorney General, E. L. Mahlin and *Frank S. Howell*, for plaintiff in error.

*J. C. Cook, Eugene O'Sullivan* and *Frank Gaines, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

GOSS, C. J.

The defendant was acquitted by the jury. This is a proceeding brought by the state as plaintiff in error to review alleged errors in instructions. It is provided for by sections 10192, 10193, and 10194, Comp. St. 1922.

No bill of exceptions showing the evidence is before us. The bill of exceptions, settled and allowed by the trial judge, consisted of the usual transcript of the record, the items of which it is unnecessary to list here.

The defendant was charged in each of the eight counts of the information with unlawfully receiving a deposit, knowing the bank to be insolvent. Comp. St. 1922, sec. 8010. While count one was dismissed, it contains the description of the bank, incorporated by reference into each of the other seven counts. As it is typical of those submitted to the jury, we quote it:

"In Dodge county, Nebraska, on or about January 7, 1928, the First State Bank of North Bend, Nebraska, a banking corporation organized, existing and transacting a banking business under the laws of said state relating to banks, did unlawfully accept and receive into said banking corporation on deposit from one E. A. Hoff, subject to his checking thereon, money, bank bills, United States currency, checks, drafts and credits in the sum and value of one hundred thirty-seven and 25/100 ($137.25) dollars, the exact character and description thereof complainant is unable to more fully give, said banking corporation being, at said time, insolvent. On said date, Thomas J. Kastle, defendant, then being president, director, officer, agent and employee of said banking corporation, by virtue whereof he had custody, charge, direction and control of

the business affairs of said banking corporation, did then and there, then and there being, by virtue of said official positions, knowingly, unlawfully, and feloniously accept and receive, and cause to be accepted and received, into, and on deposit in, said banking corporation, the aforesaid deposit in manner aforesaid, knowing that said banking corporation was then and there insolvent."

The state assigns as error the giving by the court of instruction No. 12, as follows:

"12. Even though you find from the evidence and beyond a reasonable doubt that the First State Bank of North Bend was in fact insolvent on the 7th, 9th and 10th of January, 1928, when it is alleged in the information that the deposits in question were received by the defendant Kastle, and that the defendant Kastle knew it to be insolvent, nevertheless, if you further find that the department of trade and commerce knew substantially as much about the condition of said bank as defendant Kastle knew about it, and permitted it to remain open, and if you further find that defendant Kastle, on and prior to the 7th, 9th and 10th of January, 1928, believed and expected in good faith, and on reasonable grounds, that he could strengthen its condition and continue it in business as a going concern and eventually, and within a reasonable time, restore it to a condition of solvency, then and in such case, you would not be justified in finding the defendant guilty."

The state also assigns as error the giving by the court of instruction No. 13, as follows:

"13. You are instructed that the allegation of the information that the defendant Kastle was in control of the bank in question is not a material allegation. If you find from the evidence and beyond a reasonable doubt that defendant Kastle, personally and voluntarily and of his own free will and choice, received one or more of the seven deposits referred to in the information knowing the bank to be insolvent at the time, you would be justified in finding against him as to such element of the crime. If, on

the other hand, you find that in receiving the deposits, or any of them, he was not acting freely and voluntarily but as a mere agent or employee or under the direction of some other person or agency, or if there is a reasonable doubt in your minds as to such question, you should find him not guilty."

All the instructions given by the court are shown in the record. In instruction No. 5 the court had instructed the jury as to the elements of the crime necessary to be proved by the state beyond a reasonable doubt before finding the defendant guilty on any count. Briefly stated, these are: (1) That the bank accepted and received the deposit on or about the date stated; (2) that the defendant was president, director, officer, agent or employee of the bank at the time; and (3), as such, accepted and received, or caused to be accepted and received, into such bank, such deposit; and (4) that the defendant then knew said bank to be insolvent.

The brief of defendant in error filed by counsel appointed by the trial judge under the authority of section 10192, aforesaid, and his oral argument on the hearing, challenge the right of the state to have the instructions reviewed in the absence of a bill of exceptions showing the evidence presented at the trial. That brief says: "We find no quarrel with any of the propositions of law cited by counsel as abstract propositions. The difficulty is in applying these propositions to the material facts in the case, *and we have no facts.*" Defendant in error cites no cases or precedents.

The state takes the position that each of the instructions complained of shows on its face that it is erroneous— that, assuming the ultimate facts, as stated by the court, to be found by the jury, this would not lead to the conclusion that the defendant was not guilty.

Before concluding what the applicable rule is, it is necessary to determine what the issues of fact and the law were. Shortly stated, the defendant was charged, as we have shown by the quoted typical count, with receiv-

.ing deposits, knowing that the bank was insolvent. The issue was joined by his plea of not guilty. It is presumed that the state's evidence made out at least a *prima facie* case by proving the necessary elements involved in the charge. Otherwise, the cause would not have been submitted to the jury. The defendant then had the right, under his plea of not guilty, to offer any competent evidence tending to show that he was not guilty of the offense charged. In the absence of a bill of exceptions containing the evidence, what is the law as to what must be considered by us as having been presented by the evidence to the jury?

When no bill of exceptions, showing the evidence, is presented on review, instructions that might have been proper under any evidence that might have been legally admissible under the pleadings or information will not be held prejudicial and erroneous. The presumption of law is in favor of the instructions. *Connor v. Schreiner-Flack Grain Co.*, 2 Neb. (Unof.) 188; *Willis v. State*, 27 Neb. 98; *Oltmanns v. Findlay*, 47 Neb. 289; *Home Fire Ins. Co. v. Weed*, 55 Neb. 146; *Clary v. State*, 61 Neb. 688; *Meyers v. Menter*, 63 Neb. 427. By our own decisions we seem to be consistently committed to this rule and it is unnecessary to cite cases from other jurisdictions on this point.

However, no instruction can be considered proper under the evidence if it states the law erroneously when applied to the particular fact or state of facts clearly indicated by the instruction itself. This seems legally self-evident, because in such a situation the error of law appears on the face of the instruction itself. In *Willis v. State, supra,* it was said that, in such circumstances, the instructions "will be presumed to be correct, unless they misstate the law and contain propositions which could not be held correct in any possible case made by the proof under the complaint or information upon which the prosecution was founded."

The department of trade and commerce is an executive and administrative branch of the state government. Comp.

St. 1922, sec. 7243. It is given general supervision of banks and banking under the laws of the state. Comp. St. 1922, sec. 7982. It may under certain conditions take charge of a state bank and turn it over to the guaranty fund commission. Laws 1925, ch. 30, sec. 1, amending Laws 1923, ch. 191, sec. 11.

The guaranty fund commission, created by chapter 191, Laws 1923, was, under section 18, as amended by section 4, ch. 30, Laws 1925, given power to manage any bank, which it had taken over from the department of trade and commerce, "as a going concern, without regard to its solvency, and, through employees, perform all duties and acts of the officers and directors of such bank while managing the same."

The offense of receiving a deposit when a bank is insolvent is not a crime of itself but it is a felony created by the statute relating to banks. Moral turpitude is not involved. Good motive is not a defense. The statutes give no authority to the department of trade and commerce to receive, or to authorize the receiving of, deposits by an insolvent bank. The statutory power or authority to receive deposits in such a bank resided alone, at the time in question, in the guaranty fund commission. It had no authority over any bank until it was taken over by it. Not the bank or any of its officers, nor the department of trade and commerce or any of its agents, had such power or authority. Moreover, it was the statutory duty of the department of trade and commerce, when it took over a bank, to place it in charge of the guaranty fund commission.

Under his plea of not guilty the defendant might have relied on lack of evidence on the part of the state to prove beyond a reasonable doubt the essential elements of the offense charged; or he might have produced evidence that he was absent at the time the offense was committed, that he was incompetent to commit the act, that another committed the act, that the guaranty fund commission was in charge of the bank, operating it "as a going concern,

without regard to its solvency," and that he was, at the time the deposit was received, an employee of the commission and received the deposit under its direction.

By instruction No. 12 the court advised the jury in effect that the evidence justified them in finding (1) that the department of trade and commerce knew substantially as much about the insolvency of the bank as the defendant knew but permitted the bank to remain open; and (2) the defendant at the time of receiving the deposits had reasonable ground for believing in good faith that he could continue the bank in business as a going concern and restore its solvency; and (3) if they found these facts, the court instructed them, as a matter of law, they would not be justified in finding the defendant guilty.

From what has gone before we have seen that the department has no authority to operate an insolvent bank or to authorize a bank, its officers or employees, to violate the criminal laws by receiving deposits when they know the bank is insolvent. Good faith and hopefulness, though ever so patent as facts, are impotent as defenses. Assuming that these facts stated in the instruction were derivable from the evidence, they did not in any degree justify the conclusion of law that the defendant was not guilty. The instruction was erroneous, as is shown on its face.

By one alternative of instruction No. 13 the court advised the jury, in effect, that there was evidence that, in receiving deposits for the insolvent bank, "he was not acting freely and voluntarily but as a mere agent or employee or under the direction of some other person or agency;" and they were instructed, as a matter of law, that if they so found, or if there was a reasonable doubt in their minds as to such question, they should find the defendant not guilty. On account of the absence of the evidence and because this instruction does not bear internal evidence of all the facts the court had in mind, we are unable definitely to say that all of this part of the instruction is erroneous. We know however that, as we have demonstrated

elsewhere in this opinion, there was only one "person or agency" that could legally direct a banker to accept a deposit in an insolvent state bank on or about January 7, 1928—that was the guaranty fund commission. The department of trade and commerce could not. If, as implied in the previous instruction, the true facts showed that the guaranty fund commission was not in charge of the bank, then this part of instruction No. 13 ought not to have been given.

The state also suggested as error the refusal of the trial court to give an instruction requested by the state. That instruction refers to certain arguments of counsel, states that there "is no evidence before you to justify such remarks of counsel," etc., and asks the jury to disregard such arguments. As the evidence is not before us, we cannot say that there was any error in the refusal to give this requested instruction. The court may have decided the alleged remarks were not made or that the state took no exception to them or that their effect had been taken care of at the time they were made.

Under section 10194, Comp. St. 1922, the judgment here does not in any manner affect the judgment of the district court. But the decision here determines the law governing similar cases pending or those that may arise hereafter. As indicated in the opinion, the exceptions are allowed in part and otherwise denied.

EXCEPTIONS ALLOWED IN PART, AND DENIED IN PART.

EBERLY, J., dissenting.

To the conclusions above set forth and to the extent that the disposition of this case by the majority involves the sustaining of any exceptions on the part of the state, I respectfully dissent. The proceedings under consideration are governed by sections 29-2021, 29-2314 to 29-2316, Comp. St. 1929. We are not here concerned with the provisions of our declaratory judgment statute. The sections referred to, and here exclusively controlling, were enacted in 1873 as part of the Criminal Code. In substance they

provide: "The county attorney may take exceptions to any opinion or decision of the court during the prosecution" of a criminal case; "and the bill containing the exceptions, upon being presented, shall * * * be signed and sealed by the court, *which bill shall be made a part of the record,* and be in all respects governed by the rules established as to bills of exceptions in civil cases, except as herein provided." And they further provide procedure for the presentation and review of the exceptions thus taken, and as to the effect of the determination made. The Civil Code, reference to which was above made, in force at the time of the enactment of these statutes, contains, among others, the following pertinent provision: "No particular form of exception is required. The exception must be stated, with so much of the evidence as is necessary to explain it, and no more, and the whole as briefly as possible." Civil-Code of 1866, sec. 309. The statute, it may be said, contemplated the hearing of the exceptions thus taken, only after entry of final judgment, and limited this court to the determination of "the law of the case." *State v. Badberg,* 108 Neb. 816.

The records of this court will further disclose that, so far as the subject of pleading may be material, the approved method of presenting the state's exceptions, established by more than a half century of substantially uniform usage and custom, is: The usual transcript containing the final order or judgment to which the bill of exceptions is attached shall be filed, together with a pleading in the nature of a petition in error. Strawn, Supreme Court Practice and Forms, 268-276. In the instant case the state has wholly failed to conform to this established practice; no evidence taken at the trial has been preserved; no final order or judgment appears in the transcript. No authentic record whatever is presented disclosing a history of the action taken by the trial court, and the so-called bill of exceptions has never been filed in nor made a part of the record of the case in the district court, as expressly required by the terms of the statute. True, we

do not overlook the presence here of what purports to be a "transcript of judge's notes," but this court is committed to the view that for the purpose of appeal the trial court speaks only by its journal. We have uniformly denied the competency of "judge's notes" to evidence the history of judicial procedure or establish the fact of a final judgment as a prerequisite to review, both in civil and criminal cases. *Anderson v. Griswold,* 87 Neb. 578; *Union Central Life Ins. Co. v. Saathoff,* 115 Neb. 385.

It might be admitted that the sole basis presented here for review is a copy of an information verified and filed April 4, 1930, properly charging the defendant in separate counts, as an officer of an insolvent bank, with receiving eight separate deposits "on or about" certain dates set forth therein, then knowing such bank to be insolvent; together with a copy of instructions to the jury given and refused by the trial court judge, and a copy of a verdict of the jury determining the defendant not guilty. The condition of the record thus submitted, including the absence of a bill of exceptions containing evidence received in the court below, necessarily precludes us from investigating the transactions involved, determining the facts thereof and the rule of criminal law applicable thereto which their nature may invoke. This renders it impossible for this tribunal to properly determine the "law of the case" tried and disposed of in the district court for Dodge county.

The function of this court in cases of this nature is limited to the "determination of the law of the case" under consideration. *State v. Badberg,* 108 Neb. 816; *State v. Krasne,* 103 Neb. 11; *State v. DeWolfe,* 67 Neb. 321. "The only authority this court has to take cognizance of crimes is given by the Constitution in the grant of appellate jurisdiction." *State v. Missouri P. R. Co.,* 64 Neb. 679; *State v. Union P. R. Co.,* 67 Neb. 141; *Bell v. Templin,* 26 Neb. 249; *Edney v. Baum,* 70 Neb. 159; *State v. Hall,* 47 Neb. 579; *Western Union Telegraph Co. v. State,* 86 Neb. 17.

Jurisdiction of the supreme court is limited in both original and appellate proceedings, the former by Constitution and the latter by statute. *Johnson v. Parrotte,* 46 Neb. 51. We are further expressly denied the exercise of other than appellate judicial powers in criminal cases. Const. art. II, sec. 1.

As to the "doctrine of the law of the case" as a controlling precedent, the following is submitted for consideration: "The doctrine of *stare decisis* contemplates only such points as are actually involved and determined in a case, and not what is said by the court or judge outside of the record or on points not necessarily involved therein. Such expressions, being *obiter dicta,* do not become precedents. It is a maxim not to be disregarded, that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit where the very point is presented for decision." 7 R. C. L. 1003, sec. 31. Again: "The authority of a former decision as a precedent must be limited to the points actually decided on the facts before the court." 15 C. J. 939. *"Mere abstract questions of law cannot be made the subject of litigation, so that, when once determined, the determination must be applied in all subsequent litigation between other and different parties merely because the same question of law is involved.* The positive authority of a decision is coextensive only on the facts on which it is founded, and it can apply only in subsequent cases in which the issues are similar. Accordingly, in applying the rule of *stare decisis* to a former decision, the language of the opinion in the earlier case must be construed with reference to the particular facts presented in that case." 15 C. J. 941. The rule has received full recognition in Nebraska, and this tribunal has even held that points stated in the syllabi, unless this rule is complied with, are to be considered mere *dicta. Wilson v. Ulysses Township,* 72 Neb. 807; *State v. Marsh,* 107 Neb. 637.

This rule we have also applied to proceedings of the nature now before us. In *State v. Moore,* 1 Neb. (Unof.) 213, decided in 1901, which was unanimously approved by the court, appears the following statement of the controlling limitation applicable to questions presented by the present record: "In proceedings under section 515 of the Criminal Code, this court will confine itself to the record as in other cases." In the opinion supporting this syllabus appears the following well-considered observations: "But we deem it unwise to go beyond the record in any case, more especially in cases of this character. *Dictum* is generally mischievous, even in cases involving a real controversy, and, in the nature of things, must be more so in proceedings like this which are *ex parte* in character." The sole purpose which the statutes under consideration serve is to enable this court, as a court, and in a manner and under conditions which give to its pronouncements the authority of a precedent, to determine the law "to govern any similar case" hereafter arising. To render a statement of law thus made entitled to authority as a precedent, it must be involved in and presented by the facts of the case, and disclosed by the record then for consideration and be made a controlling point of any judgment rendered therein. Manifestly this requirement is impossible to conform to, in view of the condition of the record before us, in which we are wholly unadvised as to the actual facts involved in the case presented. Nor are we able to accept the proposition that the question of proper instructions in the instant case is to be determined as a question of abstract law, without reference to any concrete case, on the theory that the instructions presented for review were erroneous, no matter what the facts might be.

This court is committed to the view that "An instruction which is correct in its application to the evidence will be upheld, and this, it has been held, is so, although it may be erroneous as an abstract proposition." 38 Cyc. 1622; *Nichols & Shepard Co. v. Steinkraus,* 83 Neb. 1.

Nor is the question here presented one as often raised by demurrer to an information or indictment, but it is one in which the controlling facts of the exact dates of the receipt of the deposits, as established by the evidence at the trial, are necessary to determine the criminality of the act and the punishment required by the legislation in force at the time of the actual commitment. The record before us affords no basis to determine the statutory provisions in force on the day the crime was actually committed, assuming that fact to have occurred. True, the information filed on the 4th day of April, 1930, says the crimes charged therein were committed "on or about" certain dates specified. But, under such charge, it was not necessary that the offense be proved to have been committed on the date alleged in the indictment. It was sufficient to have proved it to have been committed within three years prior to the finding of the indictment or the filing of the information. *Yeoman v. State,* 21 Neb. 171. In the instant case evidence establishing the commission of the crime charged on or after April 4, 1927, and prior to April 4, 1930, would be competent and support the conviction, provided the date actually established by the evidence was one on which a law punishing the offense was then in force and effect. Now, the bank act in force April 4, 1927, was quite different from that which was in force April 4, 1930. By an amendment effective April 30, 1929, radical changes were made, both in the provisions of statute as to the management and control and operation of banks and in the nature of crimes punishable by the act. The majority opinion seeks to cover the question here suggested by the words "at the time in question," yet neither in the opinion nor in the record is there aught which in the slightest degree suggests a logical answer to the simple question, "When did it occur?" or in any manner identifies the precise statute involved.

Judicial pronouncements, though in form of opinions, as to law not involved in or arising from facts then before a court, are not and cannot be deemed properly judi-

cial in character. The power exercised is indeed legislative and the result, as in the instant case, is, in fact, if not in form, a declaratory enactment. We do not overlook the statement from the bar, at the time of the first argument of this cause by the representatives of the state, that an opinion was necessary in this matter to secure conviction in a score of offenses charged under the banking act, heretofore committed and now pending in the several district courts of this state. It is respectfully submitted, however, that the majority opinion may not be considered as the "law of the case," being *obiter dictum*, nor can it evidence the "law of the land."

"By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial." 2 Cooley, Constitutional Limitations (8th ed.) 736. This court knows nothing of the facts involved in the present pending score of prosecutions referred to, just as the majority know nothing about the facts involved in the instant case. This court has heretofore in the most solemn manner declared that the constitutional right of appeal in a criminal case involves the right of the accused to be heard in this court on both fact and law, in person or by attorney. Still as a necessary and intended result of the majority opinion now adopted, in fact, if not in form, in each of the pending prosecutions, this court, so far as the questions of law involved are concerned, has responded to the demand made upon it, and, without inquiry in effect condemned, without hearing rendered judgment, and without trial interpreted the law, all without the presence of any of the accused persons. In substance and in spirit, if not in form, the action taken is a substantial violation of sections 3 and 11, art. I, and of section 1, art. II, of the Constitution of this state.

Even so, we are impressed with the view that, considered as a mere abstract proposition, the conclusion announced in the majority opinion is erroneous.

We are not here concerned with the Criminal Code of this state, but solely with the provisions of the Civil Administrative Code, being originally enacted as chapter 190, Laws 1919. The section relied upon by the state to support a conviction in this case is section 30, art. 16, title V, ch. 190, Laws 1919, being but a single section of a complete "Civil Administrative Code." The situation presented renders imperative the application of certain rules of construction to determine the legislative intent evidenced by section 30 involved, in the light of the entire enactment. They may be epitomized as follows: (1) All sections of this Code, including section 30, which make up the entire enactment, together with subsequent amendments thereto, must be construed together. (2) Section 6, art. IV of the Constitution, is also important in view of the conceded rule that, "When a Constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one or the performance of the other." 1 Cooley, Constitutional Limitations (8th ed.) 138. (3) As unquestionably remedial legislation the Administrative Code, as to its declaratory and directory provisions, must be liberally construed. *Buckmaster v. McElroy,* 20 Neb. 557; *McIntosh v. Johnson,* 51 Neb. 33; *Becker v. Brown,* 65 Neb. 264. (4) "The section of an act properly amended should be construed precisely as though it had been originally enacted in its amended form." *State v. Hevelone,* 92 Neb. 748. (5) Special provisions of a statute in regard to a particular subject will prevail over general provisions of the same or other statutes, so far as these are in conflict. *Albertson v. State,* 9 Neb. 429; *State v. Clarke,* 98 Neb. 566. (6) "A statute may be remedial in one part and penal in another. And the same statute may be remedial for certain purposes, and liberally construed therefor, and at the same time be of such a nature, and operate with such harshness upon a class of offenders subject to it, that they are entitled to invoke the rule of strict construction." 2 Lewis' Sutherland, Statutory Construc-

tion, p. 645, sec. 337. (7) "But one provision (of a statute) may be qualified by another, though it does not profess to have that effect. Words expressive of a particular intent incompatible with other words expressive of a general intent will be construed to make an exception." 2 Lewis' Sutherland, Statutory Construction, p. 660, sec. 345. (8) "General words may be cut down when a certain application of them would antagonize a settled policy of the state." 2 Lewis' Sutherland, Statutory Construction, p. 662, sec. 347. In the last above cited section it is further stated (page 664) : "In determining the scope of general provisions there is a leaning to prevent absurdity, for it cannot be deemed intended; also injustice, for like reason."

Reading chapter 190, Laws 1919, as amended, and as an entirety, it is plain that the legislative intent is thereby evidenced that the administration of all laws embraced within this Code was by its terms vested in the governor. For the purpose of aiding him in this task and making executive control efficient and practical and exclusive, executive and administrative departments were created, of which the department of trade and commerce constituted one. For a similar reason the governor was provided with a secretary of the department of trade and commerce, who, subject to the provisions of this chapter, was under the direction and control of the governor, and, as his authorized representative, executes the powers and discharges the duties vested by law in his department. And the chief executive is expressly vested with the power, and charged with the duty of enforcing, through the agency of the secretary of the department of trade and commerce created by this act, all the provisions contained in this title and all provisions which may be hereafter enacted as amendatory thereof. Laws 1919, ch. 190, title V, art. 1, sec. 1. These provisions thus referred to include all provisions relating to banks and banking, including section 30 above quoted, which business is expressly declared by the terms

of this enactment to be a quasi public business and subject to regulation and control by the state.

This Administrative Code, by acts supplemental and amendatory thereto, was in 1923 and 1925 amended to include therein the provisions of law relative to the guaranty fund commission with their several duties and powers. As provided by article 1, title V, ch. 190, Laws 1919, this guaranty fund commission then was, and continued to be, nothing but a governmental agency expressly by the terms of the constitutional provision referred to and of the statute placed under the supervising control and direction of the governor, to be exercisable either by himself in person, or through the secretary of the department of trade and commerce as his representative.

This necessarily involved the right and power of the chief executive and the right and power of his representative, the secretary of the department, to determine the necessity for and to give and impose direction authoritative and final either upon the membership of the guaranty fund commission, or upon a representative of that commission in actual charge of an institution, to conduct it as a going concern (whether solvent or insolvent), and, as an incident thereto, to accept and receive deposits made in the usual course of business. To deny it would in effect be to deny the constitutional power of the executive to take care that the law be faithfully executed, and to deny his constitutional power to carry out the policy evidenced by the statute, and securing the efficient and economical administration of the public laws.

Therefore, we submit that the sole conclusion which the Civil Administrative Code as an entirety supports is that, whatever the guaranty fund commission might do, it was at all times under the supervising constitutional control and statutory direction of the chief executive of the state; that the secretary of the department of trade and commerce was his proper representative, authorized to act as to all matters governed by the banking act for the executive and in his behalf. While the secretary of the de-

partment of trade and commerce was necessarily strictly subordinate to the governor, whatever they or either of them directed, within the scope of their powers, it was the mandatory duty of this subordinate agency, the guaranty fund commission, to carry out and perform. Everything the guaranty fund commission did, or could do, was no more than the exercise of delegated constitutional and statutory powers vested in the executive, in the manner approved by the legislature, and agreeable to the will of the governor. Whatever the terms of the statute authorized the executive in person or by subordinates to do, direct, or authorize to be done, which were in fact so done or authorized, could not be within the criminal sanction of section 30, nor subject to its penalties, because the statutes involved must be construed as an entirety, liberally as to directory provisions, and, so far as penalties were concerned, with strictness. The special provisions of the statute relating to conducting the business of an insolvent bank as a going concern, if in apparent conflict with the general provisions of that statute defining the penalties provided for violations of its terms, will prevail.

It is respectfully submitted, therefore, that the majority opinion erred in stating the following as a conclusion, viz.: "The statutes give no authority to the department of trade and commerce to receive, or to authorize the receiving of, deposits by an insolvent bank. The statutory power or authority to receive deposits in such a bank resided alone, at the time in question, in the guaranty fund commission." And it is further respectfully submitted that, during the existence of the guaranty fund commission, there was never a time that the governor of this state, either in his own capacity or through the secretary of the department of trade and commerce, had not the supreme right and power to expressly direct and demand and authorize the reception of deposits by an insolvent bank, either by or through his secretary of the department of trade and commerce, through the guaranty fund commission, or even by the direct action of the chief executive

or secretary transmitted to the agents of the state in charge of the insolvent institution.

As to the effect of the act of 1929 providing for the repeal of the guaranty fund commission law upon the appointees of that commission who, when the last named act became effective were solely engaged in discharging their statutory duties of managing an insolvent bank "as a going concern" without regard to its solvency, and as an incident thereto of accepting and receiving deposits, we express no opinion.

In view of the conclusion announced herein by the majority, the concluding sentence of section 8, ch. 38, Laws 1929, which reads: "Appointees of the guaranty fund commission shall become and continue the appointees of the secretary of the department of trade and commerce with the same duties and compensation until otherwise directed by said secretary"—is respectfully referred to their future consideration.

DAY, J., joins in this dissent.