JOHN M. FLANNIGAN V. STATE OF NEBRASKA.

FILED NOVEMBER 16, 1933. No. 28548.

*J. J. Harrington* and *J. C. Cook,* for plaintiff in error.

*Paul F. Good, Attorney General, William C. Ramsey* and *Irvin A. Stalmaster, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and SHEPHERD, District Judge.

ROSE, J.

In a prosecution by the state in the district court for Holt county, John M. Flannigan, defendant, who had

been president of the Citizens Bank of Stuart, was charged in each of eleven counts of the information with feloniously receiving deposits, knowing the bank to be insolvent. He pleaded not guilty and upon a trial was convicted on three counts and acquitted on the others. For each of the three felonies of which the jury found him guilty, he was sentenced to serve a term of two years in the penitentiary, the terms to run consecutively. As plaintiff in error defendant presents for review the record of his conviction.

At the bar and in the brief counsel for defendant vigorously argued that the evidence is insufficient to support the verdict and that consequently the conviction should be reversed. The determination of this question required a critical examination of a complicated record containing more than 1,200 pages of typewritten and printed matter. The sufficiency of evidence essential to a conviction is of course a material inquiry. The statute under which defendant was accused reads as follows:

"No corporation transacting a banking business under this article shall accept or receive on deposit for any purpose any money, bank bills, United States treasury notes or currency, or other notes, bills, checks, drafts, credits or currency, when such corporation is insolvent, and if any corporation transacting a banking business under this article shall receive or accept on deposit any such deposits when said corporation is insolvent, the officer, agent or employee knowingly receiving or accepting or being accessory to, or permitting or conniving at the receiving or accepting on deposit therein or thereby, any such deposit as aforesaid, shall be guilty of a felony, and, upon conviction thereof shall be punished by imprisonment in the penitentiary not less than one year nor more than ten years." Comp. St. 1929, sec. 8-147.

Intentional fraud, deceit, false reports of banking affairs and wrongful entries on bank books are not elements of the particular felony defined by the statute and charged in the information. Moral turpitude is not necessarily

an issue. Good motive in accepting deposits, knowing the bank to be insolvent, is not a defense in a prosecution of this kind. *State v. Kastle,* 120 Neb. 758. A commercial state bank is conducted under a charter from the state. Its business is affected with a public interest. It is entrusted with and uses money of depositors. It keeps its own records and books of account. Its executive officers have at hand the means of ascertaining facts that impart knowledge of its condition. They are naturally prompted by self-interest to look constantly into the condition of the bank's liabilities and assets. Insolvency of a bank may bring calamity on a community and increase public burdens imposed by resulting litigation and the support or care of additional paupers. To protect the people at large and depositors as a class, the legislature by law warned bankers at their peril not to accept deposits knowing the bank to be insolvent and this without regard to motive or intent to deceive. *Banks v. State,* 185 Ark. 539, 82 A. L. R. 1051. In considering the sufficiency of the evidence to sustain the verdict, therefore, intent and deceit will not be regarded as material issues.

One or the other of two definitions of insolvency has been adopted in different jurisdictions. One is known as the "bankruptcy rule" and defines insolvency as "the inability of a bank to pay its obligations as they become due in the ordinary course of business." See note and cases collected in 81 A. L. R. 1160, and 85 A. L. R. 812. See, also, *Adler & Sons Clothing Co. v. Hellman,* 55 Neb. 266. The other rule may be stated, in substance, as follows: A bank may be deemed insolvent when it is unable to meet the demands of its creditors in the usual and customary manner and when the cash value of its assets is insufficient to pay its liabilities, allowing a reasonable time to realize on such assets. In the case at bar it is unnecessary to determine which of these rules should govern in testing the sufficiency of the evidence herein, since the trial court gave defendant the benefit of the more liberal definition and so instructed the jury.

The deposits which defendant was convicted of receiving in. violation of statute were as follows: November 22, 1930, $250 by Frank McDermott; November 22, 1930, $140 by W. S. Arter; November 26, 1930, $30.47 by Mary Higgins. The bank was permanently closed by the department of trade and commerce for insolvency December 1, 1930. It was conclusively shown that the Citizens' Bank of Stuart was "a corporation transacting a banking business" under the banking laws of Nebraska during November, 1930, when the three deposits in question were received; that those deposits were made on the dates mentioned while defendant was president of the bank in active control. To justify a verdict of guilty the state was required to prove further, beyond a reasonable doubt, that the bank was insolvent when the deposits were received and that defendant received them knowing of such insolvency. Does the record contain such evidence?

George W. Woods was banking commissioner of the state under the department of trade and commerce. In that capacity he had supervisory control of state banks open for the transaction of commercial banking, with power to close a bank for insolvency. He was a witness at the trial and testified defendant called him by telephone December 1, 1930, and said in substance: "We can't make it. We are unable to open tomorrow. You'll have to send a man to take us over." This was four days after the last of the three deposits was received and eight days after the two deposits of November 22, 1930, were received. The evidence shows that defendant had been connected with the bank more than 30 years and that he and his brothers had been interested in other banks; that he had at hand the means of ascertaining the facts telephoned to Woods; that previously, within two weeks, he had considered and discussed with the vice-president and cashier the affairs of the bank in reference to insolvency. In connection with these and other evidential circumstances the jury were at liberty to find from the telephone communication to which Woods testified that

the bank was insolvent December 1, 1930, and that defendant then knew it. Is the evidence also sufficient to support the verdict that the bank was insolvent eight days earlier, November 22, 1930, and that defendant then had knowledge of the insolvency? Were insolvency and knowledge first learned by defendant after November 26, 1930, between the date of the last deposit and the notice by defendant to Woods that the bank was insolvent?

The amount of the deposits, the relative value of the assets and the extent of the reserve were material inquiries on the issue of insolvency. *Westbrook v. State,* 120 Neb. 625; *State v. Brewer,* 202 N. Car. 187, 81 A. L. R. 1424. In response to a call, defendant, president, and his brother James, vice-president of the bank, appeared before Woods, commissioner of banking, July 30, 1930, at Lincoln, and were examined in regard to many items carried on the books of the bank as assets but which had been criticized in a report of an examiner July 14, 1930. The testimony of Woods tends to prove the following summarized facts: One by one he inquired of defendant about each of the criticized items of assets in the examiner's report and gave him an opportunity to supply any additional information and to correct any errors. In the examination by Woods it was shown that the conceded deposits were $454,000 and the reserve was then about 8 per cent., though the legal reserve was 15 per cent. After different items listed as assets had been discussed in detail, defendant was told by Woods that he was convinced the losses would aggregate at least $100,000.

During the examination commenced July 30, 1930, Woods, according to his testimony, turned directly to defendant and inquired of him: "John, have you got the property? Have you got the financial ability? Can you and your brothers put in money in the next few months, if we give you time, to make this bank solvent—to cover these losses and protect these depositors?" The answer of defendant, to which Woods testified, was: "Yes, sir; we can, and we'll do it." Defendant was then

given until December 1, 1930, to restore the bank to solvency with private funds or property. It is a fair inference from the testimony of Woods and from the promise of defendant to restore solvency that the bank was insolvent July 30, 1930, that defendant then knew it and that it could only be put on a solvent basis by resort to private means beyond the credit and resources of the bank itself. Stockholders and executive officers are not required to replace worthless paper or impaired assets of a bank with their own bankable paper or private funds, but they may do so voluntarily. They have the alternative of allowing the bank to be closed. In making the examination of criticized assets with defendant participating, Woods acted under his oath and bond as a public officer. In testifying at the trial he was bound by his oath as a witness. His evidence shows that he was an expert in banking and as such competent to express an opinion as to insolvency, based on his knowledge of the bank's admitted liabilities of $454,000 and information disclosed by his detailed examination of depreciated and worthless assets to the extent of $100,000 in connection with a reserve depleted to about 8 per cent. of deposits, though there are decisions to the contrary. *State v. Brewer*, 202 N. Car. 187, and cases cited in 81 A. L. R. 1431-1434.

The cashier of the bank was also examined as a witness for the state and testified in effect that he and the vice-president frequently discussed the affairs of the bank with defendant in absence of others between November 16, 1930, and November 30, 1930, when the deposits in controversy were received; that on one occasion when the officers were present, either defendant or the vice-president said in substance: We can't make the grade, boys, unless we are able to liquidate some of our banks; or, boys, we can't make the grade unless we get the reserve up. There is also evidence from which the following facts may be inferred: The condition of the bank grew steadily worse after November 14, 1930, until it was

closed December 1, 1930, when the reserve was reduced to about 2 per cent. of deposits. Neither defendant nor any one else replaced worthless notes or depreciated or valueless property with bankable paper or private funds or with the resources or credits of other banks to an extent restoring solvency. The bank's interest in real estate was carried on its books as available assets in amounts far in excess of values. Income from real estate had been diminished or lost. Other real estate had not been converted into cash or bankable paper, though represented as bank assets for more than five years. Chattel security had been lost or had become worthless. Witnesses examined by the state testified in detail to the worthlessness or depreciation, for banking purposes, of paper and other forms of property held by the bank to an extent evidencing losses exceeding in the aggregate $150,000. A single deposit subject to check exceeded the cash on hand for payment of deposits generally. Within two weeks prior to the closing of the bank good notes were exchanged for unpaid deposits subject to check and also for immatured or past-due certificates of deposit and friends or relatives of defendant received part or all of their deposits. The conclusion upon a full review of the record is that the verdict is supported by competent evidence on the issues of insolvency and knowledge.

The verdict is also challenged on the ground that the evidence is insufficient to prove beyond a reasonable doubt that defendant personally received the three deposits enumerated in the verdict of guilty. After the examination by the banking commissioner, July 30, 1930, the bank was permitted to receive deposits during the time allowed for restoring it to solvency. It was the policy of the bank and its officers during that period to receive deposits. Defendant owned four-fifths of the capital stock and was in control. He had been connected with the bank from its organization in 1895. While he had been absent on the business of the bank at short intervals, he had intimate knowledge of its transactions. He had per-

sonally brought deposits to the bank and at times had made entries in its books. In addition he testified in substance that he was fully informed as to what was going on in the bank; that he was familiar with its condition during the last two weeks it was open; that during the last week of November, 1930, the deposits were received with his permission. From evidence of the facts and circumstances outlined, the jury were at liberty to find that the acts of receiving the three deposits enumerated in the verdict of guilty were the acts of defendant.

An assignment of error and a vigorous argument were directed to the proposition that the trial court erred to the prejudice of defendant in permitting one of his witnesses to testify on cross-examination by the state, over proper objections, that the bank declared large dividends in 1900 and later. The extreme example in this line of testimony is evidence that on April 26, 1903, the bank took $20,000 from its profits and added that much to its capital stock, which was equivalent to a dividend of 400 per cent. The vice-president of the bank, defendant's witness, so testified on cross-examination. The obvious purpose of the state in disclosing this remote and immaterial matter was to counteract other immaterial matter first brought into the record by defendant himself on cross-examination of the cashier who testified that it was always the policy of the bank to assist the farmers and ranchmen and to promote their interests; that the Flannigans shipped in dairy cows and distributed them among the farmers; that the bank did not lend money to packing houses or railroads or deal on the board of trade but confined its business to agricultural interests. This testimony and the immaterial testimony showing profits in 1900 were of course erroneously admitted. Both parties brought error into the record by inquiring about remote, collateral matters, but it does not follow that defendant was prejudiced by the immaterial evidence of remote profits. While cross-examining the vice-president on this collateral matter, special counsel for the prosecution

stated in open court that nothing illegal was disclosed by it. Solvency and prosperity of the bank 30 years ago, though immaterial, were inferences favorable to defendant. The issues submitted to the jury did not include the collateral matter of which defendant complains and the errors were harmless as to him.

It is also insisted there was error in the admission of verified income tax reports showing defendant drew as president of the bank a salary of $3,000 in 1928 and 1929, though his annual salary never exceeded $1,800. The reports were properly admitted to impeach the credibility of defendant as a witness. *Flannigan v. State, ante,* pp. 163, 169.

It is further argued that the trial court erroneously refused to give an instruction containing the maxim, *Falsus in uno, falsus in omnibus.* The record does not disclose an occasion for the giving of such an instruction. Other rulings in the giving or refusing of instructions are also challenged as erroneous but are found to be free from error prejudicial to defendant.

A serious demand for a reversal of the conviction is made on the ground of misconduct of special counsel appointed by the attorney general to assist the county attorney in the prosecution. When the misconduct occurred, J. O. Jamison was on the witness-stand. He had testified on direct examination as a witness for defendant, and was being cross-examined by the state. After he had been asked about some papers, there was a recess. Immediately upon the reconvening of court special counsel for the state propounded the following: "Mr. Jamison, you were standing over there and talking to Jim Flannigan, and you asked him if 'I have to produce those papers'—isn't that right?" Referring to what the question implied, counsel for defendant said: "That's an absolute falsehood," and those identical words were repeated by him. The rejoinder was: "Do you think I'm a liar? I heard it with my own ears." This was followed by special counsel's resentment of interference with the

state's cross-examination. Counsel for defendant retorted: "He deliberately tried to deceive this jury, and I charge him with doing so." Special counsel then stated he had been listening to defendant's attorney framing witnesses in the hotel. "You're a liar" was hurled back. The presiding judge was finally able to stop the torrents of shameless misconduct of counsel on both sides and addressed them and the jury as follows:

"The court instructs the jury to disregard the statements of both counsel, and directs the attention of both counsel that from the standpoint of courtesy and orderliness and decency, both to the court and to the jury, that an exhibition of this kind between counsel, both of them, is unwarranted. The statements made by counsel, each of them, the court instructs the jury to pay no attention to, and at no time to pay any attention to statements of counsel, except as the same may be sustained by the evidence. * * *

"Counsel for the defense has called the court's attention to a statement relative to the framing of witnesses, and the court directs the jury to pay no attention to that statement. There is nothing in the evidence or the conduct of counsel to warrant it, and counsel are admonished not to make similar remarks because such remarks are unwarranted, and the court also, upon its own motion, suggests to counsel for the defendant that the use of epithets that were used should not have been used in open court. Any contest between lawyers may be had without the use of such words. The court also condemns the use of the words 'framing witnesses' as without foundation, regrettable and unfair, and the statement should not have been made, and directs the jury to pay no attention to that, or to the conduct of counsel, or any conduct of counsel which is not supported by the evidence."

Neither counsel out-stripped the other in misconduct and the trial court properly treated both alike. The episode condemned in its entirety by the trial court was introduced by provocation on the part of counsel for

defendant, but no amount of provocation could justify the misconduct of special counsel. Neither did the provoking conduct of special counsel in wrongfully accusing his opponent of framing witnesses justify the offensive epithet. In departing from proper decorum neither counsel performed any worthy service for his client nor aided the court in the administration of justice. Misconduct of counsel tends to bring reproach upon the court of which they are trusted officers. They were admitted to the bar to serve clients according to law and correct standards of ethics and to aid the courts in the high aim for judicial independence, impartiality, purity, dignity and excellence. The first duty imposed on attorneys by statute is "To maintain the respect due to the courts of justice and to judicial officers." Comp. St. 1929, sec. 7-105. There was no justification for the departures from professional or statutory standards. Improper and offensive statements by each attorney were directed to the other and not to defendant, upon whom no reflections were cast. Neither party gained an advantage by misconduct of counsel. There is no good reason to suspect that the jury disobeyed the positive instructions of the court to pay no attention to the unwarranted statements of counsel. The verdict is based on competent evidence. The conclusion is that defendant was not prejudiced by misconduct of counsel in view of the rebuke from the bench and the instructions to the jury. Prejudicial error in the proceedings and judgment has not been found.

AFFIRMED.